OPINION
On July 2, 1998, the apartment manager for an apartment building at 100 North Garfield received a call from a tenant worried that Mongkhon Kour, another tenant, had not been seen for some time and a strong odor was emanating from his apartment. The apartment manager called 9-1-1 and the police entered Kour's apartment and found his partially decomposed body. He had been shot once in the back of the head. The police found a spent .22 shell casing near the body. On July 4, 1998, the police arrested appellant, Omar A. Jastrow, because he was driving Kour's automobile, had Kour's social security card and Kour's insurance card in his possession.
The police took appellant to police headquarters. He was advised of his rights and executed a rights waiver form. After being fingerprinted, the police interrogated him for a little more than one hour. The police then left him alone for several hours while a search warrant of his apartment was executed. The police found a .22 caliber semiautomatic weapon underneath appellant's pillow. The police also found Kour's vehicle registration and insurance papers in appellant's apartment. After further interrogation lasting several hours, appellant admitted he shot Kour, then stole his automobile, registration, social security card, insurance cards and bank account information, which he used to close Kour's accounts consisting of approximately $5,000.
A Franklin County Grand Jury indicted appellant on two counts of aggravated murder with specifications, one count of aggravated robbery with specifications and one count of receiving stolen property. The trial court overruled a motion to suppress appellant's statement.
At trial, appellant attempted to prove he acted as a result of sudden passion or a sudden fit of rage and, hence, was guilty of voluntary manslaughter, not aggravated murder. Appellant testified about his life in Cambodia. When he was a young child, the Khmer Rouge ruled Cambodia from 1975-1979. His family was forced out of their home and into labor camps. He witnessed torture, starvation and execution. His younger brother starved to death and appellant was beaten many times. After the Vietnamese liberated Cambodia in 1979, his family eventually entered the United States in 1982. In 1996, he met Kour at the public library and the two became friends since they were both from Cambodia. Appellant became suspicious that Kour was a former member of the Khmer Rouge and was attempting to indoctrinate appellant in Cambodian communism. Appellant testified that he went to Kour's apartment to end their friendship; however, when he told Kour the friendship was over, Kour called appellant a "pig" (an Asian curse) and made "a violent gesture towards the bathroom." (Tr. Vol. III, 190; 285.) Appellant testified that he thought Kour was going to punch him or grab something and strike him. He believed Kour was vicious because the Khmer Rouge was so vicious and cruel. Appellant testified that, when Kour was furious and yelling at him, he flashed back to Cambodia and could not remember anything and started "steaming." (Tr. Vol. III, 191.)
After a jury trial, the jury found appellant guilty of aggravated murder with specifications, aggravated robbery with specifications and receiving stolen property. Appellant was sentenced to life imprisonment without eligibility for parole. Appellant filed a notice of appeal and raises the following assignments of error:
ASSIGNMENT OF ERROR NO. 1:
 THE TRIAL COURT ERRED IN ADMITTING APPELLANT'S STATEMENT TO POLICE, AS IT WAS OBTAINED INVOLUNTARILY IN VIOLATION OF DUE PROCESS LAW AS GUARANTEED IN THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR NO. 2:
 THE TRIAL COURT ERRED IN ADMITTING APPELLANT'S STATEMENT TO POLICE, AS IT WAS OBTAINED IN VIOLATION OF MIRANDA V. ARIZONA (1966), 384 U.S. 436.
ASSIGNMENT OF ERROR NO. 3:
 THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AS THE EVIDENCE AGAINST APPELLANT DID NOT ESTABLISH GUILT OF MURDER BEYOND A REASONABLE DOUBT.
By the first assignment of error, appellant contends that the trial court erred in admitting appellant's statement to the police because it was obtained involuntarily and violated his due process rights. Appellant argues that, since the police officers threatened appellant with physical violence, his confession could not have been voluntary. According to police, during the interview, appellant clenched his hands and became very tense. The following exchange took place:
 MR. JASTROW: I don't understand why are you doing this to me.
 DETECTIVE: You start to flex on me, mister, I'm going to throw you through that wall. You understand? You better relax a little bit. You relax your posturing on me.
 MR. JASTROW: Because I don't understand this is happening. I just don't understand.
 DETECTIVE: Making fists and you flex on me and I'm going to throw you through that wall.
MR. JASTROW: I'm not going to strike you or anything.
 DETECTIVE: Be the last things you ever did. Now you start telling us the truth. You've been lying to us since we started. Now let's start telling the truth. [Tr. of videotaped interview, Vol. IV, 86-87.]
Appellant argues that the threats of physical violence, along with leaving appellant alone in the interrogation room for several hours while the search warrant was conducted, constitute a coercive environment.
The prosecution bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. Coloradov. Connelly (1986), 479 U.S. 157, 167. The issue of whether a confession was made voluntarily is a question of law.State v. Booher (1988), 54 Ohio App.3d 1, 7. The basic test for voluntariness is "whether an examination of all the circumstances discloses that the conduct of `law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" State v. Edwards
(1976), 49 Ohio St.2d 31, 40, vacated in part on other grounds (1978), 438 U.S. 911.
To determine whether a defendant's confession was involuntarily induced, the court should consider the "`totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'"State v. Slagle (1992), 65 Ohio St.3d 597, 600, certiorari denied (1993), 510 U.S. 833, quoting Edwards, at paragraph two of the syllabus. To constitute an involuntary confession, there must be both police misconduct and such misconduct must have caused the defendant's confession. Colorado. Admonitions to tell the truth are considered to be neither threats nor promises, and are permissible. State v. Loza (1994), 71 Ohio St.3d 61, 67, certiorari denied (1995), 514 U.S. 1120.
In a hearing on a motion to suppress evidence, the trial court is the trier of fact and a reviewing court should not disturb the trial court's findings of fact if they are supported by competent, credible evidence. Such findings based upon credibility determinations are to be accorded great deference.State v. Callihan (1992), 80 Ohio App.3d 184, 191; State v. Smith
(1991), 61 Ohio St.3d 284, certiorari denied (1992),502 U.S. 1110.
In this case, the police detective threatened physical violence against appellant. The police officer testified as follows concerning the reasons why such tactics were necessary:
 A. The interview rooms are very small. They're approximately ten foot by ten foot. The last thing I want is a confrontation with somebody in one of those rooms, particularly when your interview is as critical during an investigation as this one is. I felt that if we had a confrontation in the interview room the interview would probably be ended, and we didn't want that. As a police officer you start to learn the signs of somebody that is tensing up, that is going to become physically aggressive with you. I noticed those signs and what I was trying to do was I was trying to cut him short very quickly, calm him down so he'd get on with the interview, and that's what I did.
Q. What signs did you notice in Mr. Jastrow?
 A. His body became rigid. He started to flex his arms and ball up his fists. That's a sign that he's going to become physically aggressive.
 Q. Did you attempt to intimidate him into giving a statement?
 A. No. My purpose was just to calm him down quickly, to let him know that we weren't going to put up with that so we could move on with the interview. [Tr. Vol. II, 77-78.]
After the exchange, appellant relaxed and the interview continued. Appellant continued to deny any involvement in the killing. The following exchange took place:
 DETECTIVE: The guy [Kour] is over here. He's applying for U.S. citizenship. You said yourself he's got a job. The man has had a couple of different jobs, never had a problem working over here in the United States, probably a very hard-working individual. He ain't going back over there to get a job. I think you made this whole trip thing up to cover your tracks on the car.
MR. JASTROW: No.
DETECTIVE: Because you took the car from him.
 MR. JASTROW: No. No. No. No. No. No. [Tr. Vol. IV, 101-102.]
It was only after the detectives expressed a view that the bullet and appellant's gun would match, and appellant would spend the rest of his life in prison, that appellant confessed. After the detectives warned appellant that he would spend his life in prison if convicted, appellant told them he would rather die. The detectives then advised appellant that telling the truth could be helpful and explained that there may be justifiable reasons for killing another as follows:
 DETECTIVE: I'm tired of this. I'm tired of talking to you. Okay? We're just going to do the paperwork, send you off to jail tonight, and if the gun matches, which we'll find out probably by tomorrow if the gun matches, you'll be charged with murder and you will never, ever get out.
 MR. JASTROW: What will happen to me for the thing that I didn't do?
 DETECTIVE: You'll spend the rest of your life in prison if you get convicted of it.
MR. JASTROW: I would rather die.
 DETECTIVE: I told you that telling us the truth can help and lying can hurt. But you refuse to do that. If something else happened there that makes this not a murder, then things would be handled differently. If there was a rage, sudden burst of anger, if it was an accident, if he was threatening you, there are reasons sometimes people shoot other people and kill them. But based on what you're telling us we have nothing else to go on except for these matches on this gun and the shell casing, and if that comes back, then it's murder. Because we have no other angle to look at. You see what Detective Eppert is saying?
 DETECTIVE: Sometimes people do things to one another because they had to, okay?
 MR. JASTROW: Like what will happen to those people who — the people who do?
 DETECTIVE: I tell you what. Let's say we have two people, okay? We got these two people, okay? Let's say one person threatens to kill the other person or they get into a fight and the other person pulls a gun and shoots the guy.
MR. JASTROW: Yes.
 DETECTIVE: Then it's different punishment. That's a different charge than if this person just goes over to that guy's house and just kills him in cold blood. The reasoning behind what you do is very, very important in the judge's and the jury's eyes. Okay? If there are good reasons for behind what you did, that makes a big difference, a very large difference. Sometimes it can be justified.
 If you are protecting yourself, that's a justified situation. If he was threatening you or blackmailing you or if you guys were struggling over the gun and it goes off, that's a justified situation. That's an accident.
 But if a person just goes over to another person's house and kills him in cold blood, that's a whole another thing and that's much worse. Okay? Like I said before, this is your time to tell us the truth. Once we're done with tonight, once we pack you off to jail, you're finished. We're done talking. You can't justify it at that point. We will never know why you did what you did until it goes to trial and then sometimes it's too late.
 So if something happened between you and Mr. Kour, we need to know why, what, what happened, and how this happened. I can see through your eyes that you are pondering this, that you are thinking about this.
 MR. JASTROW: Do you remember I mentioned about the Khmer Rouge?
DETECTIVE: Yes.
MR. JASTROW: He was the Khmer Rouge.
 DETECTIVE: This man was the Khmer Rouge? So was he an evil man?
 MR. JASTROW: Yes. You want the truth, huh? [Tr. Vol. IV, 104-106.]
It was only after a discussion involving the possible consequences that might follow when someone has a justifiable reason for killing another that appellant confessed. Appellant argues that, pursuant to Arizona v. Fulminante (1991), 499 U.S. 279, threats of physical violence are sufficient to find coercion. While Arizona does indicate that threats of violence are sufficient to find coercion, the threat must actually induce the defendant to confess. In this case, it was not the physical threat of violence which convinced appellant to confess but his understanding that there may be a lighter sentence for one who has a justifiable reason for killing. Appellant continued to deny the killing even after the physical threat. The threat did not induce appellant to confess.
Appellant also argues that the length of time appellant was left alone in the interrogation room while the search warrant was executed also contributed to a coercive environment. In this case, appellant was left alone for approximately two to three hours. During the evening, appellant was fed and offers to use the restroom were made. The time period was not unreasonable and does not constitute a coercive environment.
Applying the test of voluntariness set forth in Edwards,
in reviewing the totality of the circumstances in this case, we conclude the trial court was correct in finding appellant's statements were voluntarily made and appellant was not improperly threatened or induced into confessing. Thus, appellant's first assignment of error is not well-taken.
By his second assignment of error, appellant contends that the trial court erred in admitting appellant's statement to the police because it was obtained in violation of Miranda v.Arizona (1966), 384 U.S. 436. The burden is on the prosecution to prove that appellant made a knowing, intelligent and voluntary waiver of constitutional rights. In Miranda, the United States Supreme Court held that interrogation in police custody requires safeguards, or Miranda warnings to protect a defendant's constitutional rights. The statements of a defendant may not be used against him in a subsequent criminal proceeding unless the prosecution can prove that the defendant was informed of theMiranda warnings, and made a knowing and intelligent waiver of such rights. A defendant's signature on a Miranda waiver is strong proof of the validity of the waiver but is not conclusive proof that the waiver was made knowingly and intelligently. Statev. Scott (1980), 61 Ohio St.2d 155, paragraph one of the syllabus. In State v. Dailey (1990), 53 Ohio St.3d 88, 91, the Supreme Court of Ohio quoted the United States Supreme Court in Moran v. Burbine
(1986), 475 U.S. 412, 421, and stated that the determination of whether a defendant knowingly and intelligently waived his Miranda
rights involves a two-step process:
 * * * "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." * * *
The court in Moran continued: "Only if the `totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."
In this case, the detectives read the rights waiver form to appellant, asked appellant to read the waiver himself and then asked him if he understood. He replied affirmatively. The detective then asked appellant whether he wanted to speak to them about the events. Appellant replied: "Yes. Clearly I wish to speak to you." (Tr. Vol. IV, 4.)
Appellant entered this country in 1982, and attended Columbus Public Schools. He graduated from Columbus East High School in 1987. He is articulate and demonstrates an understanding of his rights. He affirmatively agreed to speak to the detectives. The trial court found appellant made a knowing, intelligent and voluntary waiver of his constitutional rights and we find no error. Appellant's second assignment of error is not well-taken.
By the third assignment of error, appellant contends that the verdict is against the manifest weight of the evidence. The test for whether a judgment is against the manifest weight of the evidence involves a limited weighing of the evidence by the court to determine whether there is sufficient, competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. State v. Conley
(Dec. 16, 1993), Franklin App. No. 93AP-387, unreported (1993 Opinions 5437). In State v. Thompkins (1997), 78 Ohio St.3d 380,387, the Supreme Court of Ohio described the standard of review, as follows:
 * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on the weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's [Law Dictionary (6 Ed. 1990)], at 1594.
Appellant argues that the jury should have found him guilty of voluntary manslaughter, not murder. R.C. 2903.03
defines voluntary manslaughter as follows:
 (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.
In State v. Shane (1992), 63 Ohio St.3d 630, 634, the Supreme Court of Ohio discussed the requirements of proof necessary for voluntary manslaughter, including that the sudden passion or sudden fit of rage must be brought on by serious provocation by the victim that is "reasonably sufficient" to incite a person to use deadly force. The court stated, as follows:
 * * * In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. * * *
In this case, appellant testified about his life in Cambodia and the violence and torture he experienced under the Khmer Rouge. Appellant also testified that he felt threatened by Kour and he flashed back to his life in Cambodia and could not remember anything.
However, the jury either did not believe that Kour sufficiently provoked appellant or that appellant experienced a sudden passion or a sudden fit of rage. Credibility issues are for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Appellant took a loaded gun to Kour's apartment on the day he was to confront him, he shot Kour in the back of the head, and then, afterwards, went through Kour's possessions to steal Kour's social security card, insurance card, vehicle registration, vehicle and bank account information, which he used to close Mongkhon Kour's accounts consisting of approximately $5,000. Appellant admitted that four days after the killing he impersonated Kour at two banks in order to close the accounts. During the police interview, appellant stated that the killing was "the act of the patriotism. It's not the acts of crime." (Tr. Vol. III, 286.) There was sufficient, competent evidence that the jury could conclude that appellant acted with prior calculation or design, or that the killing took place during the commission of a robbery. Appellant's third assignment of error is not well-taken.
For the foregoing reasons, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 __________________________ BOWMAN, PRESIDING JUDGE
TYACK and KLINE, JJ., concur.
KLINE, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District.